THE BERNSTEIN LAW GROUP P.C.
MARC N. BERNSTEIN (SBN 145837)
Email: mbernstein@blgrp.com
SARAH BOTZ (SBN 191006)
Email: sbotz@blgrp.com
555 Montgomery Street, Suite 1650
San Francisco, CA  94111
Telephone: (415) 765-6633
Facsimile: (415) 283-4804

SIDEMAN & BANCROFT LLP
DONALD J. PUTTERMAN (SBN 90822)
Email: dputterman@sideman.com
One Embarcadero Center, Eighth Floor
San Francisco, CA 94111
Telephone: (415) 392-1960
Facsimile: (415) 392-0827

Attorneys for Defendant,
F-SECURE, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| DIAGNOSTIC SYSTEMS CORPORATION,<br><br>                    Plaintiff,<br><br>          vs.<br><br>SYMANTEC CORPORATION, et al.,<br><br>                    Defendants. | Case No.: SACV06-1211 DOC (ANx)<br>(**CONSOLIDATED** with Case No. SACV07-960 AG (MLGx))<br><br>**F-SECURE, INC.'S OPPOSITION TO ACACIA ENTITIES' MOTION TO DISMISS AND/OR STRIKE F-SECURE'S COUNTERCLAIMS**<br><br>Action Filed:   Dec. 14, 2006<br>Trial Date:      Oct. 21, 2008<br><br>Hearing:        Feb. 19, 2008<br>Time:            8:30 a.m.<br>Courtroom:    9D<br><br>The Honorable David O. Carter |

1   F-SECURE, INC.,                               )
2                  Counterclaimant,              )
3          vs.                                    )
4   DIAGNOSTIC SYSTEMS                            )
    CORPORATION, ACACIA                           )
5   RESEARCH CORPORATION,                         )
    ACACIA PATENT ACQUISITION                     )
6   CORPORATION, and ACACIA                       )
    TECHNOLOGY SERVICES                           )
7   CORPORATION,                                  )
8                  Counterclaim-Defendants.      )
9   _____)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF CONTENTS

2    TABLE OF CONTENTS…………………………………………………..……… i

3    TABLE OF AUTHORITIES CITED…………………………………..……… ii

4    I.    INTRODUCTION………………………………………………………… 1

5    II.   PROCEDURAL BACKGROUND ...................................................... 2

6    III.  ARGUMENT ...................................................................................... 3

7          A.    THE COURT HAS SUBJECT MATTER JURISDICTION OVER
                 ACACIA.......................................................................................... 3

8
                 1.    All Of Acacia's Jurisdictional Arguments Presuppose It Has
9                      Already Won the Alter Ego Determination.................................. 3

10               2.    The Acacia Entities Are Alter Egos of DSC, and of Each Other...7

11                     a.  Unity of Interest ................................................................. 8

12                     b.  Inequitable Result ............................................................ 13

13               3.    If the Court Wishes Still Further Alter Ego Evidence, It Should
                       Allow F-Secure to Gather It. ............................................... 14
14
           B.    ACACIA'S 12(B)(6) ARGUMENT RELIES ON EXTRINSIC FACTS,
15               AND SHOULD BE REJECTED.................................................... 15

16         C.    F-SECURE'S COUNTERCLAIMS ARE TIMELY.................................... 15

17               1.    Due to DSC's Addition of Ten Additional Defendants, All
                       Parties Have Agreed to Extensions of the Original Case
18                     Management Deadlines.................................................... 15

19               2.    If The Court Concludes Leave To Amend Is Needed, F-Secure
                       Respectfully Requests It. ................................................. 16
20
           D.    F-SECURE WILL ADD THE REQUESTED DETAIL TO ITS
21               INEQUITABLE CONDUCT ALLEGATIONS.......................................... 17

22   IV.   CONCLUSION ................................................................................. 18

23

24

25

26

27

28

1

# TABLE OF AUTHORITIES CITED

2

**Cases**

3

4

*Baize v. Eastridge Companies*, 142 Cal. App. 4th 293
  47 Cal. Rptr. 3d 763 (Cal. Ct. App. 2006)....................................................... 8

5

6

*Beam Laser Sys., Inc. v. Cox Communications, Inc.*, 117 F. Supp. 2d 515 ....  (E.D. Va. 2000)
  ................................................................................................................. 6

7

8

*Chan v. Soc'y Expeditions, Inc.*, 123 F.3d 1287 (9th Cir. 1997)........................ 7, 10

9

*Cognex Corporation v. VCode Holdings, Inc.*, 2006 WL 3043129
  (D. Minn. Oct. 24, 2006) ............................................................................ passim

10

11

*DePuy, Inc. v. Zimmer Holdings, Inc.*, 384 F. Supp. 2d 1237 (N.D. Ill. 2005) .................... 6

12

*Ellis v. All Steel Constr. Inc.*, 389 F.3d 1031 (10th Cir. 2004)............................ 5, 6

13

14

*EMS-American Grilon, Inc. v. DSM Resins, Inc.*, 1989 WL 230919
  (D.N.J. Oct. 5, 1989) ................................................................................... 6

15

16

*In re School Asbestos Litigation*, 921 F.2d 1310 (3rd Cir. 1990)........................... 14

17

18

*Laub v. U.S. Dept. of the Int.*, 342 F.3d 1080 (9th Cir. 2003) ............................... 14

19

*Local 159 v. Nor-Cal Plumbing, Inc.*, 185 F.3d 978 (9th Cir. 1999) .................................. 5, 6

20

21

*Madey v. Duke University*, 307 F.3d 1351 (Fed Cir. 2002) ................................... 14

22

*Merial Ltd. v. Intervet Inc.*, 430 F. Supp. 2d 1357 (N.D. Ga. 2006) ...................... 6

23

24

*Mill Cabinet Pension Trust Fund v. Valley Cabinet & Mfg.*,
  877 F.2d 769 (9th Cir. 1989) ....................................................................... 7

25

26

*Monaco v. Liberty Life Assurance Co.*, 2007 WL 1140460
  (N.D. Cal. April 17, 2007) .......................................................................... 8

27

28

*North County Communications Corp. v. California Catalog & Tech.*,
  2007 WL 4200203, (S.D. Cal. Nov. 26, 2007)............................................. 6

*Peacock v. Thomas*, 516 U.S. 349 (1996)..................................................................5, 6, 7

*Pharmachemie B.V. v. Pharmacia S.p.A.*, 934 F. Supp. 484  (D. Mass. 1996) .....................6

*Pub. Util. Dist. No. 1 of Grays Harbor County Wash. v. IDACORP Inc.*,
    379 F.3d 641 (9th Cir. 2004) ..................................................................................15

*Rosen v. E.C. Losch, Inc.*, 234 Cal. App. 2d 324,
    44. Cal. Rptr. 377 (Cal. Ct. App. 1965) ..................................................................8

*Schwarz Pharma, Inc. v. Paddock Lab., Inc.*, 504 F.3d 1371 (Fed. Cir. 2007) .....................6

*Site Microsurgical Sys., Inc. v. Cooper Cos., Inc.*,
    797 F. Supp. 333 (D.C.Del. 1992)..........................................................................6

*Wechsler v. Macke Int'l Trade, Inc.*, 486 F.3d 1286 (Fed. Cir. 2007)................................7, 8

**Statutes**

35 U.S.C. Section 285 ......................................................................................................14

Fed. R. Civ. P. 12(d)........................................................................................................15

Fed. R. Civ. P. 15(a)(3)......................................................................................................2

**Other Authorities**

Donald S. Chisum, *Chisum on Patents* §21.03[4] (1st Ed. 1978 & Supp. 2003 .................6

*Piercing the Corporate Veil: The Alter Ego Doctrine Under
    Federal Common Law*, 95 Har. L. Rev. 853 (1982)...............................................7

F-Secure, Inc.'s Opposition To Acacia Entities' Motion To Dismiss And/Or Strike Counterclaims

1    This is F-Secure, Inc.'s opposition to the motion of Acacia Research

2    Corporation (Acacia Research), Acacia Patent Acquisition Corporation

3    (APAC), and Acacia Technology Services Corporation (ATSC) (together,

4    Acacia or the Acacia Entities) to dismiss and/or strike F-Secure's

5    counterclaims.

6

7    I.    INTRODUCTION

8    Without citation to any evidence or even a hint of argument, the

9    Acacia Entities presuppose they are not alter egos of DSC.  From there it

10   is only a short step to indignation at having been sued, and to a

11   vehement denial of jurisdiction.  Not treated or even mentioned in

12   Acacia's papers is the striking evidence that DSC and the three Acacia

13   entities are nothing more than different names for the same people.  The

14   four "companies" occupy the same suite in the same building, share the

15   same officers, directors, managers, and employees, use the same

16   attorneys, and act with such unity of method and purpose that their own

17   people forget whose hats they are wearing as they attend meetings,

18   engage counsel, and threaten other companies with litigation.

19   If, as F-Secure has alleged and will prove, Acacia and DSC are

20   simply different names for the same entity, then subject matter

21   jurisdiction follows as a matter of course.  The Court unquestionably has

22   jurisdiction over DSC; so it also has jurisdiction over those who are

23   legally indistinguishable from it.  *E.g.*, *Cognex Corporation v. VCode*

24   *Holdings, Inc.*, 2006 WL 3043129, at *9-*11 (D. Minn. Oct. 24, 2006)

25   (finding subject-matter jurisdiction over Acacia Research based on

26   subject-matter jurisdiction over its alter-ego subsidiaries).

27   Acacia is also wrong that F-Secure's counterclaims are untimely.

28   Since the Court entered its original scheduling order, DSC has added ten

1   new defendants to the case.  To accommodate these new defendants, the
2   parties have agreed to several global extensions of existing case
3   management deadlines.  In addition, a superseding scheduling order
4   will soon issue, encompassing the new defendants.  That scheduling
5   order will presumably have a fresh deadline for defendants to add
6   parties or claims.

7

8       II.    PROCEDURAL BACKGROUND
9        DSC filed an amended and consolidated complaint on
10  November 8, 2007.  (Plaintiff's Consolidated First Amended Complaint
11  dated Nov. 8, 2007 (Docket No. 224).)
12       This required F-Secure to amend its answer within ten days,
13  Rule 15(a)(3), which F-Secure timely did.  (F-Secure's Amended Answer
14  and Counterclaims (AAC) (Docket No. 250) dated Nov. 30, 2007.)
15       The amended answer made explicit an inequitable conduct defense
16  previously implicit in F-Secure's unclean hands defense, and also added
17  declaratory relief counterclaims based on inequitable conduct.  (*Compare*
18  AAC at 19-21, 24-25 *with* F-Secure's Answer to DSC's Complaint (Docket
19  No. 43) filed Feb. 9, 2007 at 11, 12-13.)
20       The amended answer also added Acacia Research, APAC, and
21  ATSC as new parties, including them in F-Secure's declaratory relief
22  counterclaims.  (AAC at 22-25.)  In addition, the amended answer
23  alleged that the Acacia Entities and DSC were alter egos.  (AAC at 22-24.)
24  The reasons included:

25

26      •    DSC, APAC, and Acacia Research have no employees,
           sharing instead those of ATSC;
27      •    The companies all share the same directors and officers;
28

- The companies all work out of the same office at the same address;

- The same lawyers represent all four companies;

- DSC, ATSC, and APAC are all wholly-owned by Acacia Research; and

- Acacia, not DSC, wrote the demand letters in this case, stating that Acacia (not DSC) had devoted significant engineering and legal resources to investigating F-Secure's products vis-à-vis the patents.

*Id.*

III.   ARGUMENT

    A.   THE COURT HAS SUBJECT MATTER JURISDICTION OVER ACACIA

        1.   All Of Acacia's Jurisdictional Arguments Presuppose It Has Already Won the Alter Ego Determination.

Nowhere in their motion do the Acacia Entities address whether, as F-Secure alleges, they are alter egos of DSC.  Instead, Acacia's facts and jurisdictional arguments make a single, central point: that Acacia has assigned DSC all of its "right, title, and interest" to the patents in suit. (Mem. 1:16 – 3:26; 4-9.)   On the basis of that contention—plus the key, but unspoken, presumption that the Acacia Entities are not alter egos of DSC—Acacia urges three versions of the same argument: that it cannot be sued over patent rights it has already given away.  (Mem. §§ III.A.1, .2, and .3.)

The problem is the unspoken presumption.  If Acacia and DSC *are* alter egos—as F-Secure has alleged, and will prove—then federal jurisdiction is automatic.  Jurisdiction over DSC necessarily entails jurisdiction over all legally indistinct others.

1   That was precisely the holding of *Cognex Corporation v. VCode*

2   *Holdings, Inc.*, 2006 WL 3043129 (D. Minn. Oct. 24, 2006), a case involving

3   Acacia Research in circumstances virtually identical to those here.  In

4   *Cognex*, Acacia Research formed subsidiaries named VCode and VData.

5   *Id.* at *1 (courtesy copy attached).  Acacia Research transferred to VCode

6   and VData the exclusive rights to two of its patents.  *Id.* at *7, *10.  Then,

7   using the fictitious business name Acacia Technologies Group (a name

8   Acacia also uses in this case, *see* Declaration of Marc N. Bernstein in

9   Opposition to Acacia Dismissal Motion (Bernstein Decl.) ¶ 3 & Exh. B),

10  Acacia Research sent threatening letters to seventy of Cognex's clients.

11  *Id.* at *3-*4.  As here, the letters, though drafted by Acacia Research,

12  asserted not its own patent rights but those of its VCode and VData

13  subsidiaries.  *Id.* at *3-*4 , *10.  Yet it was the subs, not Acacia, that sued

14  four Cognex clients for patent infringement.  *Id.*

15  Under fire from its clients, Cognex sued VCode and VData for a

16  declaration of patent invalidity.  *Id.* at *1-*2.  Cognex also named Acacia

17  Research as a declaratory judgment defendant, even though, as here,

18  Acacia Research no longer owned any rights to the patents and had not

19  sued the clients.  *Id.* at *7, *10.  Acacia Research brought a dismissal

20  motion, arguing that the court lacked subject matter jurisdiction.  *Id.* at

21  *1, *7.  Acacia argued that since it had already assigned all of its patent

22  rights, it could no longer sue Cognex, depriving the court of jurisdiction

23  over a declaratory relief claim.  *Id.*  These, of course, are the very

24  arguments Acacia raises here.

25  Cognex responded that Acacia Research was the alter ego of

26  VCode and VData.  *Id.* at *9.  The court agreed.  *Id.* at *11.  After

27  reviewing an array of alter ego evidence, the court found that "Acacia

28  Research has such control over VData that the two are

4

1   indistinguishable." *Id*.  Based on this finding the court held Acacia

2   Research subject to its jurisdiction.  *Id*.  That Acacia Research no longer

3   held the patents was beside the point.

4          The U.S. Supreme Court, the Ninth Circuit, and other circuit courts

5   of appeal have all embraced the principle that when a court has federal

6   jurisdiction over one party, it also has jurisdiction over the party's alter

7   ego.  *E.g.*, *Local 159 v. Nor-Cal Plumbing, Inc.*, 185 F.3d 978, 985 (9th Cir.

8   1999) (exercising federal jurisdiction over a party alleged to be alter ego,

9   where original party was subject to federal jurisdiction under the Labor

10  Management Relations Act) (citing *Peacock v. Thomas*, 516 U.S. 349, 354

11  (1996)); *Ellis v. All Steel Constr. Inc.*, 389 F.3d 1031, 1033-34 (10th Cir. 2004)

12  (holding that "if an alter-ego claim is asserted in conjunction with the

13  underlying federal cause of action, the latter may provide the basis for

14  ancillary jurisdiction over the alter-ego claim"; and noting that it is

15  "commonplace for federal courts to exercise jurisdiction over alter-ego or

16  veil-piercing claims against additional defendants in conjunction with

17  federal causes of action against primary defendants").  *Cf. Peacock*, 516

18  U.S. at 353-55 (contrasting alter-ego claims made during the pendency of

19  an original federal-question proceeding, which are allowed, with such

20  claims made in a subsequent lawsuit, which are not).

21         These and other cases all show that during the pendency of federal

22  litigation (as contrasted with after its conclusion), the courts' jurisdiction

23  over existing defendants clearly extends to the defendants' alter egos.

24         This principle renders irrelevant almost all of Acacia's argument

25  and cited authority in Sections III.A.1, III.A.2, and III.A.3 of its brief.

26  Whether or not a patentee is shielded from litigation after assigning

27  patent rights to a third party, no shield arises when the patentee assigns

28

1  the rights to itself.  Acacia's cited authorities deal only with assignments

2  to third-parties, not alter egos, and are thus inapt[1].

3      Acacia's few remaining arguments are similarly unhelpful to its

4  cause.  *North County Communications Corp. v. California Catalog & Tech.*,

5  2007 WL 4200203, *4 (S.D. Cal. Nov. 26, 2007), cited by Acacia at page 9

6  note 15 of its brief, held only that the Declaratory Judgment Act is not

7  itself a federal claim.  *Id.*  This unremarkable observation leads only to

8  the unremarkable conclusion that a declaratory relief claim does not

9  confer federal jurisdiction unless—*as here*—the declaration concerns

10  federal rights.  And *Peacock*, 516 U.S. at 353-55, cited by Acacia at page 9

11  note 16, contrasted alter-ego claims made during the pendency of a

12  federal-question proceeding, which are allowed, with such claims made

13  in a subsequent lawsuit, which are not.  Under *Peacock* (and many

14  subsequent cases, including *Local 159* and *Ellis*), F-Secure's claims are

15  proper because F-Secure is raising its alter ego claims during this

16  proceeding.

17      Finally, Acacia is simply wrong that because an alter ego theory is

18  "state law-based," "it cannot be used to establish federal subject matter

19  jurisdiction."  (Mem. 8:22 – 9:1.)  The *source* of the alter ego criteria is not

---

21  [1] *See, e.g.*, *EMS-American Grilon, Inc. v. DSM Resins, Inc.*, 1989 WL 230919, at *1 (D.N.J. Oct. 5, 1989) (one who assigns patent no longer subject to declaratory relief claims;

22  assignee not alleged to be alter ego);  *Pharmachemie B.V. v. Pharmacia S.p.A.*, 934 F. Supp. 484, 489-90 (D. Mass. 1996) (same; no alter ego claim); Donald S. Chisum,

23  *Chisum on Patents* §21.03[4] (1st Ed. 1978 & Supp. 2003) (same; no alter ego discussion); *Schwarz Pharma, Inc. v. Paddock Lab., Inc.*, 504 F.3d 1371, 1374 (Fed. Cir.

24  2007) (patent owner is required party in suit by an exclusive patent licensee; no allegation of alter ego); *Merial Ltd. v. Intervet Inc.*, 430 F. Supp. 2d 1357, 1362 (N.D. Ga.

25  2006) (patentee's corporate parent does not, by mere virtue of that fact, have standing to sue for infringement; no allegation that parent was alter ego); *DePuy, Inc. v.*

26  *Zimmer Holdings, Inc.*, 384 F. Supp. 2d 1237, 1238-41 (N.D. Ill. 2005) (same; no allegation that parent was alter ego); *Site Microsurgical Sys., Inc. v. Cooper Cos., Inc.*,

27  797 F. Supp. 333, 337-39 (D. Del. 1992) (same; no alter ego allegation); *Beam Laser Sys., Inc. v. Cox Communications, Inc.*, 117 F. Supp. 2d 515, 520-21 (E.D. Va. 2000) (sole

28  owner of patentee is not, *ipso facto*, a "patentee" with standing to sue; no claim sole owner was an alter ego).

1   important.  The result of *applying* those criteria is what matters.  If one

2   company is found to be legally indistinguishable from another, then a

3   court with jurisdiction over one has jurisdiction over both.  *Cf. Peacock*,

4   516 U.S. at 353-54 ("Piercing the corporate veil is not *itself* an

5   independent [] cause of action, but rather is a means of imposing liability

6   on an underlying cause of action") (emphasis added; internal quotations

7   marks and citation omitted).  Whether state or federal criteria are used is

8   irrelevant.

9        And anyway Acacia is wrong that alter ego theory is "state-law

10  based."  (*See* Mem. 8:22 – 9:1.)  In areas like patent law, which are

11  committed to the exclusive jurisdiction of the federal courts, "whether to

12  disregard the corporate form" is a matter of "federal substantive law."

13  *Mill Cabinet Pension Trust Fund v. Valley Cabinet & Mfg.*, 877 F.2d 769, 772

14  (9th Cir. 1989) (ERISA) (noting that the court looks to the forum state's

15  law "for guidance"); *accord Chan v. Soc'y Expeditions, Inc.*, 123 F.3d 1287,

16  1294 (9th Cir. 1997) (maritime law).  *See also* Note, *Piercing the Corporate*

17  *Veil: The Alter Ego Doctrine Under Federal Common Law*, 95 Har. L. Rev. 853

18  (1982); *cf. Wechsler v. Macke Int'l Trade, Inc.*, 486 F.3d 1286, 1295 (Fed. Cir.

19  2007) (alter ego issue a matter of regional circuit law; Ninth Circuit looks

20  to law of forum state).

21       It being clear beyond cavil that if Acacia and DSC are alter egos,

22  the Court has jurisdiction over both, we now turn to the alter ego

23  showing.

24

25

26                    2.    The Acacia Entities Are Alter Egos of
                            DSC, and of Each Other.

27       As just noted, the alter ego question is one of federal common law.

28  *Mill Cabinet*, 877 F.2d at 772; *Chan*, 123 F.3d at 1294.  The Federal Circuit

looks to regional circuit law, *Wechsler*, 486 F.3d at 1295, and the Ninth Circuit, in turn, seeks "guidance" from the law of the forum state, here California. *Mill Cabinet*, 877 F.2d at 772.

California's alter ego test has two elements: "(1) that there be such unity of interest and ownership that the separate personalities of the corporation and the individual [or second corporation] no longer exist, and (2) that, if the acts are treated as those of the [first] corporation alone, an inequitable result will follow." *Baize v. Eastridge Companies*, 142 Cal. App. 4th 293, 302, 47 Cal. Rptr. 3d 763, 770 (Cal. Ct. App. 2006). No one "litmus test" establishes alter ego liabiliy. *Id.* "[T]he result depends on the circumstances of each case." *Id.*

### a.  Unity of Interest

Key factors that have demonstrated the required "unity of interest and ownership" include:

- 100% ownership of alleged alter ego[2];
- common or intermingled officers and directors[3];
- shared addresses, facilities, or resources[4];
- shared employees[5]; and
- shared counsel[6].

---

[2] *E.g.*, *Baize*, 142 Cal. App. 4th at 298-99, 303-04, 47 Cal. Rptr. 3d at 766-67, 770-71; *Rosen v. E.C. Losch, Inc.*, 234 Cal. App. 2d 324, 333, 44. Cal. Rptr. 377, 382-83 (Cal. Ct. App. 1965); *accord Cognex*, 2006 WL 3043129, at *10.

[3] *E.g.*, *id.*

[4] *E.g.*, *Monaco v. Liberty Life Assurance Co.*, 2007 WL 1140460, at *5 (N.D. Cal. April 17, 2007); *Baize*, 142 Cal. App. 4th at 298-99, 303-04, 47 Cal. Rptr. 3d at 766-67, 770-71.

[5] *E.g.*, *Baize*, 142 Cal. App. 4th at 298-99, 303-04, 47 Cal. Rptr. 3d at 766-67, 770-71; *Monaco*, 2007 WL 1140460, at *5; *accord Cognex*, 2006 WL at *10.

[6] *E.g.*, *Baize, Monaco, supra.*

8

All of these factors, and many others, are present here.  DSC and the three Acacia Entities operate out of the same suite, in the same building, at the same address.  (Bernstein Decl. ¶ 4 & Exh. C.)  All four companies share the same employees—a necessity, since none of Acacia Research, APAC, or DSC has employees of its own.  (Bernstein Decl. Exh. A [Excerpts from Vol. I (9/25/07) and Vol. II (9/26/07) Deposition of Matthew Vella (cited hereafter as "Vella")] 19:7-9; Vella 26:6-14; Vella 132:1-8.)

The same three principals—Paul Ryan, Clayton Haynes, and Robert Harris—serve as directors of DSC, APAC, ATSC, and Acacia Research.  (Vella 18:20 – 21:10.)  All three also serve as officers of Acacia Research.  (*Id.*)

Acacia Research owns one-hundred percent of DSC, APAC, and ATSC, either directly or through still other Acacia subsidiaries.  (Bernstein Decl. ¶ 5, Exh. D at 10.)  Acacia Research has formed at least 50 such wholly-owned subsidiaries.  (*Id.*)

Since DSC has no employees, others conduct all of its business.  (*E.g.*, Vella 60:16 – 61:5; 132:1-12.)  ATSC employee Tisha DeRaimo sent over one-hundred letters on DSC's behalf, charging various companies with infringing DSC's patents.  (Vella 64:19-22; Bernstein Decl. ¶ 6.)  Even though Ms. DeRaimo is employed by Acacia Technology Services Corporation, her demand letters were sent on the letterhead of "Acacia Technologies Group," a fictitious business name used by Acacia Research.  (Vella 60:16 – 61:3; Bernstein Decl. ¶ 3 & Exh. B; *cf. Cognex*, 2006 WL 3043129, at *3-*4 (Acacia letters sent by "T. DeRaimo" of "Acacia Technologies Group").)  The letters depict Ms. DeRaimo as the "Vice President of Licensing," but in fact she is an employee of neither

Acacia Technologies Group nor Acacia Research.  (Vella 60:16 – 61:3; Bernstein Decl. Exh. B.)  The letters urge the recipients to meet with Acacia personnel, rather than with DSC personnel.  (Bernstein Decl. Exh. B.)  There was little choice; DSC has no personnel.  (Vella 19:7-9.)

When one of Acacia's demand letters motivated a recipient to enter a license with DSC, a press release issued.  Acacia issued the release, on Acacia letterhead.  (Bernstein Decl. Exh. E.)  Acacia also issues press releases for others of its subsidiaries, for example, APAC.  (Bernstein Decl. Exh. F.)  Although DSC receives licensing income, it files no tax returns.  Acacia takes care of that, reporting DSC's income in Acacia's own consolidated return.  (Bernstein Decl. Exhs. G at pp. 2, 4, D at 21.)

The three Acacia entities and DSC also all use the same lawyers.  Rutan & Tucker, LLP, named counsel for Acacia in the present dismissal motion, is also counsel of record in the case for DSC.  Shore Chan Bragalone, another counsel of record for DSC, while not named in Acacia's papers, was the law firm that e-served them on all of the parties.  (Bernstein Decl. ¶ 10 & Exh. H.)  Shore Chan also defended the deposition of APAC's and DSC's corporate representative, who in turn was an employee of ATSC.  (Vella 16:11-22.)

And finally, Acacia's intermingling of personnel and subsidiaries has grown so extensive that Acacia's own principals can no longer keep track of who is who.  When asked at his deposition to name DSC's officers, *DSC's own corporate representative* could not name even one.  (Vella 16:11-15; 19:23 – 20:1; 144:14-22.)  He initially named Paul Ryan, Clayton Haynes, and Robert Harris, but then backtracked, explaining that these were actually directors, not officers.  (Vella 18:20 – 19:3; 19:16 – 20:1.)  Though the representative had been specifically designated to

1  testify on behalf of DSC, Vella 16:11-15, he said he'd have to look at

2  corporate records to name even one DSC officer, Vella 19:23 – 20:1.

3  Later, when asked who at *DSC* would be familiar with the due diligence

4  DSC conducted before filing this lawsuit, the same DSC representative

5  named employees of *ATSC*.  (Vella 60:16-24.)

6      The representative also testified that part of his job was giving

7  reports about various Acacia subsidiaries to an Acacia "executive

8  committee."  (Vella 198:16 – 200:11.)  If he was speaking to the committee

9  about a DSC matter, then "at that moment in time" the committee

10  members would be "acting in their capacity as DSC directors."  (*Id.*)  But

11  when he "shift[ed] to the next portfolio . . .  they'll shift to [the]

12  applicable [] other subsidiaries."  (*Id.*)

13      In this make-believe game of corporate round robin, the committee

14  members were imagined to be constantly changing their hats in

15  synchronicity with the speaker:

16

17   Q:   They wear a lot of hats for a lot of different subsidiaries?

18   A:   Well, they're directors of subsidiaries and they're officers of
          a publicly-traded [parent] company.

19
20   Q:   Right.  So in a single executive committee meeting, they will
          serve as director for a number of subsidiaries?

21   A:   They will hear reports and be asked for approvals on a
          number of portfolios that belong to a number of different
22        subsidiaries.

23  (Vella 200:2-11.)

24      This is not a portrait of independent enterprises, separately run.

25  This is a portrait of a massive corporate shell game.  Acacia has so many

26  different shells (50 at last count) that its own principals have lost track of

27  who is who and which are which.

28

1   On a virtually identical record the court in *Cognex* easily found

2   alter ego liability.  There, as here, Acacia had transferred all patent rights

3   to a wholly owned subsidiary, in that case VData.  *Cognex*, 2006 WL

4   3043129, at *10.  VData was wholly-owned by another Acacia subsidiary,

5   Acacia Global Acquisitions Corporation (Acacia Acquisitions).  *Id.*

6   VData had no employees of its own, so all of its affairs were handled

7   through Acacia Acquisitions.  *Id.*  As with DSC, the revenues of VData

8   were reported on consolidated tax returns filed by Acacia Research.  *Id.*

9   The officers of Acacia Acquisitions, which controlled VData, were

10  "nearly identical to those for Acacia Research."  *Id.*

11  Also as here, in *Cognex* the same few principals ran the show.

12  Clayton Haynes, here the chief financial officer of Acacia Research and a

13  director of DSC, was there chief financial officer of both Acacia

14  Acquisitions and Acacia Research.  *Id.* at *10 n.4.  And even though "[t]he

15  principal activity of VData [was] the enforcement of its patent rights,"

16  *id.*, only two people, both employees of other Acacia entities, were

17  "involved in decisions about patent licensing and litigation."  *Cognex*,

18  2006 WL 3043129, at * 10.  One of those two people was Tisha DeRaimo.

19  *Id.*  (The other was Robert Berman, who has since left Acacia.)  As here,

20  Ms. DeRaimo prepared and sent out "invitations to enter licensing

21  negotiations."  *Id.*  Ms. DeRaimo was "identified on the letterhead of

22  Acacia Technologies Group as Vice President of Licensing," but she was

23  "evidently [] employed by a separate entity."  *Id.*  Interestingly, in *Cognex*

24  that entity was Acacia *Employment* Services Corporation, *id.*, whereas

25  here it is Acacia *Technology* Services Corporation, Vella 60:20 – 61:3.

26  The *Cognex* court also relied on Acacia Research's issuance of press

27  releases on behalf of VData.  *Id.*  When VData settled patent litigation, for

28  example, Acacia, not VData, issued the press release.  *Id.*  The release

1    "quotes Paul Ryan, the chairman and chief executive officer of *Acacia*

2    *Research*."  *Id.* (emphasis added).  All this, of course, is also true here.

3    Acacia issues press releases for DSC and its other subsidiaries, and Paul

4    Ryan is quoted in his capacity as CEO of Acacia Research.  (Bernstein

5    Decl. Exhs. E, F.)

6         In summarizing all of this evidence, the *Cognex* court noted that

7    "[b]ecause no natural persons are part of VData, all its operational

8    decisions are necessarily made by Acacia Acquisitions."  *Id.* at *11.  The

9    court said that the officers of the various Acacia entities were "nearly

10   identical," that they "perform identical duties," and that "Acacia

11   Research speaks on behalf of VData" through press releases and

12   consolidated tax returns.  *Id.*  Under these circumstances, the court said,

13   "there is no reasonable way to tell when the officers of Acacia Research

14   are acting in their capacity as officers of Acacia Acquisitions."  *Id.*  It

15   concluded that "Acacia Research has such control over VData that the

16   two are indistinguishable." *Id.*  That is, they were alter egos.  *Id.*

17        The facts here are virtually identical to those of *Cognex*.

18        Here, too, there is no question that Acacia and DSC are alter egos.

19

20                         **b.  Inequitable Result**

21        There is also no question that inequitable consequences would

22   flow from indulging Acacia's corporate shell game.  It was Acacia and its

23   employee, Tisha DeRaimo, who sent over one hundred letters asserting

24   infringement and threatening to sue.  (Bernstein Decl. ¶ 6 , Exh. B.)

25   Acacia, and not DSC, purports to have conducted such "due diligence"

26   or Rule 11 compliance as was performed before Acacia caused DSC to

27   bring suit.  (Vella 60:16-24.)  If, as F-Secure intends to prove, Acacia had

28   reason to know the patents it was asserting were procured by inequitable

1  conduct; if Acacia did not conduct even a cursory review of the

2  defendants' products before causing DSC to bring suit; if Acacia caused

3  DSC to bring suit knowing its cases against the defendants were not just

4  weak and uninvestigated but wholly meritless; then Acacia, and not just

5  its shell company, should be exposed to Rule 11 sanctions and attorneys'

6  fees under 35 U.S.C. Section 285.

7      In such circumstances *not* treating Acacia and DSC as one would

8  lead to inequity.  DSC could argue that *it* was not responsible for

9  Acacia's pre-threat and pre-lawsuit investigatory failures.  And Acacia

10  could escape responsibility entirely.  These are not fair or just outcomes.

11

12      3.    If the Court Wishes Still Further Alter
              Ego Evidence, It Should Allow F-Secure

13            to Gather It.

14      Although F-Secure believes the above record is more than

15  adequate to support an alter-ego finding, discovery on the question has

16  barely begun.  F-Secure's recent counterclaims against Acacia contained

17  the first alter ego allegations in the case.  If the Court feels further alter

18  ego evidence is needed, F-Secure requests leave of the court to obtain it.

19  *See Laub v. U.S. Dept. of the Int.*, 342 F.3d 1080, 1093 (9th Cir. 2003) (abuse

20  of discretion to grant Rule 12(b)(1) motion without first permitting

21  subject-matter-jurisdiction discovery) (collecting cases).  *Cf.  Madey v.*

22  *Duke University*, 307 F.3d 1351, 1358 (Fed Cir. 2002) (regional circuit law

23  governs questions of subject matter jurisdiction).   The Court can hear

24  and decide the question any time up to and including trial.  Fed. R.

25  Civ. P. 12(i); *In re School Asbestos Litigation*, 921 F.2d 1310, 1315 (3rd Cir.

26  1990) (citing predecessor to Rule 12(i)).

27

28

### B. ACACIA'S 12(B)(6) ARGUMENT RELIES ON EXTRINSIC FACTS, AND SHOULD BE REJECTED

Acacia recognizes, as it must, that a Rule 12(b)(6) motion tests the sufficiency of the pleadings, and may not look past the four corners of the complaint (or counterclaim).  (Mem. 9:23 – 10:3.)  *E.g.*, *Pub. Util. Dist. No. 1 of Grays Harbor County Wash. v. IDACORP Inc.***,** 379 F.3d 641, 646 (9th Cir. 2004) ("Review is limited to the contents of the complaint").

Yet Acacia's Rule 12(b)(6) argument relies entirely on facts outside of the counterclaims.  (Mem. 10:7-9.)  The argument is grounded solely on materials Acacia appends to its motion, evidence it says shows that "ARC, APAC, and ATSC do not have title to the patents-in-suit."  *Id.*

That is not a Rule 12(b)(6) argument, and the Court should ignore it.  Although the Court is entitled to convert a 12(b)(6) motion into one for summary judgment, Fed. R. Civ. P. 12(d), it should not do so here. The exercise would be empty.  As noted above, whether the patent rights are held by Acacia itself or by its alter ego, the court has subject matter jurisdiction.

### C. F-SECURE'S COUNTERCLAIMS ARE TIMELY

#### 1. Due to DSC's Addition of Ten Additional Defendants, All Parties Have Agreed to Extensions of the Original Case Management Deadlines.

Acacia argues that F-Secure's deadline for joining parties and amending pleadings expired on October 21, 2007, citing the Court's original July 23 Scheduling Order.  (Mem. 10-11.)  But since then, DSC has filed a new lawsuit against an additional five defendants, and added five further defendants to the present case.  These changes have brought several agreed revisions to the deadlines originally set in the July 23

1    Scheduling Order, which was entered before any of the new defendants

2    joined the case.

3         Thus, during an October 22 case management conference the

4    parties agreed to extend all deadlines in the July 23 Order by four

5    months.  (Bernstein Decl. Exh. I at 19:11 – 20:9.)  Then, in a telephone

6    hearing with the Court on October 29, the Symantec and Oracle

7    defendants accepted a DSC proposal to extend deadlines one further

8    month, for a total of five months' extension from the July 23 order.

9    (Bernstein Decl. Exh. J at 6:19-25.)  Assuming these extensions are

10   incorporated into a superseding scheduling order, one encompassing the

11   ten new defendants, they will move the deadline for adding new parties

12   and claims to March 2008.

13        DSC now apparently resists this implication of its own agreed

14   extensions.  (Bernstein Decl. Exh. J at 4-5.)  But under DSC's own version

15   of the new schedule, the Oracle and IBM defendants had until at least

16   mid-January 2008 to amend *as of right*, and later with leave of the Court.

17   (*Id.*)  It makes little sense for one deadline to apply to one set of

18   defendants and another to another.  Once a party or claim is added to the

19   case, it affects all parties.  And Acacia is not any more prejudiced by

20   F-Secure adding it to the case than by, say, Aspen Technologies doing so.

21   The Court should reject Acacia's tactical effort to block a defendant's

22   reasonable and non-prejudicial new claims.

23

24              2.    If The Court Concludes Leave To
                       Amend Is Needed, F-Secure
25                     Respectfully Requests It.

26        If the Court concludes F-Secure needed leave to file its Amended

27   Answer and Counterclaims, then F-Secure respectfully requests leave.

28

1      All of the above alter ego evidence demonstrates that neither

2    Acacia nor DSC can be surprised or prejudiced by Acacia's inclusion in

3    the case.  It is not as though Acacia hasn't already been intimately

4    involved in all aspects of the case, beginning from even before the

5    lawsuit was filed.  Acacia procured the patents, created DSC, transferred

6    the patents to it, sent out demand letters, hired law firms, directed the

7    firms to bring litigation, and sent its personnel to hearings and

8    depositions.  As we now know, DSC does not have any employees; and

9    Acacia itself doesn't know who DSC's officers are.  Acacia has been

10    running this show since before the show began.

11       Further, good cause justified the timing of F-Secure's amended

12    pleading.  It took time for F-Secure's counsel to gather and put together

13    the alter ego evidence.  Had F-Secure brought its counterclaim months

14    earlier based on less evidence, Acacia would no doubt now be moving to

15    dismiss on the ground that the evidence was too thin.

16       Since the Court will in any event be issuing a new scheduling order

17    to cover the Oracle and IBM defendants, F-Secure respectfully requests

18    that it and the other Symantec defendants share the amendment

19    deadlines applicable to the Oracle and IBM defendants.

20

21          D.     F-SECURE WILL ADD THE REQUESTED

                  DETAIL TO ITS INEQUITABLE CONDUCT

22                  ALLEGATIONS

23       As noted in F-Secure's concurrently-filed opposition to DSC's

24    motion to strike, upon leave of Court F-Secure will amend its inequitable

25    conduct allegations add all further specifics required under Rule 9(b).

26    (*See* Mem. 12:7-16.)

27

28

IV.   CONCLUSION

For all of these reasons F-Secure respectfully requests that the Court deny Acacia's motion to dismiss or to strike, and find that DSC and the Acacia Entities are alter egos.  If the Court wishes more alter ego evidence before ruling on Acacia's Rule 12(b)(1) motion, F-Secure respectfully requests that it be afforded the opportunity to conduct jurisdictional discovery, and present further evidence and argument, before the Court rules on Acacia's motion.

Respectfully submitted,

February 5, 2008                    THE BERNSTEIN LAW GROUP P.C.

By:       /s/ Marc N. Bernstein

Marc N. Bernstein

Attorneys for Defendant and
Counterclaimant F-SECURE, INC.

THE BERNSTEIN LAW GROUP P.C.
555Montgomery Street, Suite 1650
San Francisco, California 94111

Donald J. Putterman

SIDEMAN & BANCROFT LLP
One Embarcadero Center, 8th Floor
San Francisco, California 94111