O

# UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **DIAGNOSTICS SYSTEMS CORPORATION,**<br><br>　　　　　**Plaintiff,**<br><br>　　　　　v.<br><br>**SYMANTEC CORPORATION; F-SECURE, INC.; NETIQ CORPORATION; QUEST SOFTWARE, INC.; NETSCOUT SYSTEMS, INC.; ORACLE CORPORATION; SAS INSTITUTE, INC.; BUSINESS OBJECTS AMERICAS f/k/a BUSINESS OBJECTS INC.; BMC SOFTWARE, INC.; COGNOS CORPORATION; INTERNATIONAL BUSINESS MACHINES CORPORATION; SAP AMERICA, INC.; MICROSTRATEGY, INC. d/b/a MSIMICROSTRATEGY INCORPORATED; INFORMATION BUILDERS, INC.; ASPEN TECHNOLOGY, INC. d/b/a MASSACHUSETTS ASPEN TECHNOLOGY, INC.,**<br><br>　　　　　**Defendants.** | **CASE NO. SA CV 06-1211 DOC (ANx)**<br><br>**O R D E R** ADOPTING REPORT OF SPECIAL MASTER/DISCOVERY REFEREE WITH SOME MODIFICATIONS |

_____

　　　Before the Court is NetScout Systems, Inc.'s Motion to Compel Documents ("Motion"). The Court issued an Order on April 4, 2008, resolving all pending motions, with the exception of

the attorney-client privilege and work product doctrine claims made by Plaintiff. In that Order, the Court appointed Hon. James L. Smith of JAMS as a Special Master ("Special Master") to review documents for which DSC asserts the attorney-client privilege and/or the work product doctrine. The Special Master has provided the Report and Recommendation of Special Master/Discovery Referee ("R&R") to the Court, and the parties have been provided a copy. The Court gave the parties the opportunity to make oral arguments regarding their objections to the R&R. After considering the papers filed by the parties, oral argument by the parties, and the R&R, the Court hereby ADOPTS the R&R with some modifications.

**I.    BACKGROUND**

The present lawsuit involves two patents for which Plaintiff alleges infringement by Defendants.

On December 23, 1997, the U.S. Patent & Trademark Office issued U.S. Letters Patent No. 5,701,400 ("the '400 patent") entitled "Method and apparatus for applying if-then-else rules to data sets in a relational database and generating from the results of application of said rules a database of diagnostics linked to said data sets to aid in executive analysis of financial data." Plaintiff Diagnostic Systems Corporation ("DSC") alleges that it is the owner by assignment of all rights and interests in the '400 patent.

On July 16, 1996, the U.S. Patent & Trademark Office issued U.S. Letters Patent No. 5,537,590 ("the '590 patent") entitled "Apparatus for applying rules to data sets in a relational database to generate a database of diagnostic records linked to the data sets." DSC alleges that it is the owner by assignment of all rights and interests in the '590 patent.

The '590 and '400 patents came into DSC's possession after tracing a circuitous path. Carlos Armando Amado ("Amado") is the named inventor of the '590 Patent, the 400 Patent, and U.S. Patent No. 5,293,615 ("'615 Patent"). On March 7, 2003, Amado filed a patent infringement action against Microsoft Corporation ("Microsoft"), claiming that Microsoft had infringed the '590, '400, and '615 patents. Amado dismissed his causes of action against Microsoft arising from the '590 Patent and the '400 Patent on September 13, 2004, after receiving the Court's claim construction ruling and before the summary judgment hearing. The

1 '615 Patent was not dismissed and was litigated to a verdict.

2 Amado assigned the '590 Patent and '400 Patent to Acacia Patent Acquisition Corporation ("APAC") on December 6, 2005. Pursuant to this assignment, Amado retained a 50% royalty for any proceeds obtained from enforcement of the patents. In addition, Amado agreed in the assignment to "execute and deliver all papers" and "generally do everything possible to aid ASSIGNEE [APAC] to obtain and enforce proper patent protection for said inventions in all countries." APAC assigned its interest in the '590 Patent and '400 Patent to DSC on September 6, 2006. In this Assignment and Assumption Agreement, DSC assumed all of APAC's "rights, obligations, interests and liabilities under the Amado Assignment Agreement." Furthermore, APAC agreed in the assignment to "execute and deliver all papers" and "generally do everything possible to aid ASSIGNEE [DSC] to obtain and enforce proper patent protection." In the same month, DSC allegedly contacted over 100 companies to seek licenses on these patents and offered to disclose details of the patents, explain the due diligence process, and discuss the reasons DSC believed that the other companies' products infringed the patents.

Both DSC and APAC are wholly-owned subsidiaries of Acacia Research Corporation ("Acacia") and are in the business of acquiring, licensing, and enforcing patented technologies. Furthermore, APAC and DSC share the same officers, directors, and address.

On December 14, 2006, DSC filed its initial Complaint in this action. Subsequently, on November 8, 2007, DSC filed its Consolidated First Amended Complaint, adding additional defendants. DSC alleges that Defendants have directly infringed and continue to directly infringe the '400 and '590 patents (collectively, "the Patents"). DSC also alleges Defendants have indirectly infringed the Patents by providing non-staple articles of commerce to others for use in an infringing system and by inducing others to infringe. DSC alleges that Defendants' acts of infringement include making, using, selling, or offering for sale numerous products. DSC claims Defendants' infringement of the Patents has been willful and deliberate.

DSC is seeking a declaration, decree, damages, a preliminary injunction, a permanent injunction, costs, expenses, and pre and post-judgment interest on DSC's damages, and

1  attorneys' fees. DSC alleges infringement by the following remaining defendants in the action:
2  Symantec Corporation ("Symantec"); NetIQ Corporation ("NetIQ"); NetScout Systems, Inc.
3  ("NetScout"); Oracle Corporation ("Oracle"); Business Objects Americas f/k/a Business Objects
4  Inc. ("BOA"); Cognos Corporation ("Cognos"); International Business Machines Corporation
5  ("IBM"); SAP America, Inc. ("SAP"); Microstrategy, Inc. d/b/a MSIMicroStrategy Incorporated
6  ("Microstrategy"); and Information Builders, Inc. ("Information Builders").

7  DSC has reached settlement agreements with numerous defendants who were previously
8  named in the case. The action against Motive, Inc. was dismissed pursuant to a settlement
9  agreement on August 9, 2007. The action against CA, Inc. was dismissed pursuant to a
10 settlement and licensing agreement on August 15, 2007. The action against BMC Software, Inc.
11 was dismissed pursuant to a stipulated dismissal on March 24, 2008. Finally, the actions against
12 SAS Institute, Inc., Aspen Technology, Inc. d/b/a Massachusetts Aspen Technology, Inc., F-
13 Secure, Inc., and Quest Software, Inc. were dismissed pursuant to stipulated dismissals on March
14 25, 2008.

15 NetScout's Motion to Compel was originally scheduled for hearing on September 25,
16 2007. The week of the September 25, 2007 hearing, the parties discussed their discovery
17 disputes and conducted depositions. They ultimately resolved the majority of their discovery
18 disputes through an agreement reported to the Court on September 27, 2007. In addition, the
19 Court's Order on April 4, 2008 resolved other issues in NetScout's Motion to Compel.
20 Accordingly, only one remaining unresolved issue exists in NetScout's Motion to Compel,
21 which the Court addresses in this Order. The remaining unresolved issue is the discovery of
22 documents for which DSC claims the attorney-client privilege and/or work product doctrine.
23 NetScout seeks to compel discovery of certain documents for which DSC claims the attorney-
24 client privilege and work product doctrine.

25 The Court assigned a Special Master to review, *in camera*, the documents at issue. The
26 Special Master reviewed each of the 1,302 documents identified in "PLAINTIFF'S PRIVILEGE
27 LOG 10-29-2007" ("Privilege Log") for the purposes of determining whether the listed
28 documents are protected by the attorney-client privilege and/or work product doctrine. The

4

Special Master provided a copy of the Privilege Log with two additional columns on the right hand side of the spreadsheet labeled "Sustained" and "Produce." For each of the 1,302 documents, the Special Master indicated his recommendation to sustain the attorney-client privilege or work product doctrine or to produce the document.

In the R&R, the Special Master made special note of the fact that, during the relevant time period, the management team of DSC included 5 attorneys. However, in addition to acting as attorneys, these individuals also functioned in the capacity of corporate executives to further the business goals of DSC, primarily in regard to the licensing of the technology that is the subject of this action. Accordingly, the Special Master recommended that communications related primarily to these business functions should generally not be protected by the privileges asserted. The Special Master determined that over 550 of the documents were mislabeled in the privilege log and should be produced.

The Court gave the parties the opportunity to conduct oral arguments regarding the Special Master's recommendations on May 23, 2008. Plaintiff and NetScout each submitted supplemental briefing following that hearing. Briefing in this matter is now complete, and the Court addresses the Special Master's R&R in the instant Order.

**II.   LEGAL STANDARD**

A party may serve on another party a request to produce all relevant and non-privileged documents in the possession, custody or control of the party served. Fed. R. Civ. P. 34(a). The party receiving the request shall serve a written response within 30 days, either stating that inspection will be permitted or objecting to the request and stating the reasons for the objection. Fed. R. Civ. P. 34(b). The party making the request may seek a court order to compel disclosure when the responding party objects to the requests or otherwise fails to respond to the request or to produce the documents. *Id*.

"The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law. *Upjohn Co. v. U.S.*, 449 U.S. 383, 389, 101 S.Ct. 677 (1981) (citing 8 J. Wigmore, *Evidence* § 2290 (McNaughton rev. 1961)). The elements of the attorney-client privilege are:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal advisor, (8) except the protection be waived.

8 J. Wigmore, *Evidence* § 2292, at 554.

The work product doctrine is set forth in Fed. R. Civ. P. 26(b)(3). Pursuant to Rule 26(b)(3), "[o]rdinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative." The United States Supreme Court has set forth the essential nature of the doctrine as follows:

> In performing his various duties . . . it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. Proper preparation of a client's case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference. That is the historical and the necessary way in which lawyers act within the framework of our system of jurisprudence to promote justice and to protect their clients' interests. This work is reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways-aptly though roughly termed . . . as the 'Work product of the lawyer.' Were such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own. Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial.

*Hickman v. Taylor*, 329 U.S. 495, 510-11, 67 S.Ct. 385 (1947).

**III.    DISCUSSION**

Upon referral of this matter to the Special Master, the Special Master conducted a thorough and comprehensive review of all 1,302 documents in the Privilege Log. After analyzing and reviewing each document, the Special Master denoted whether the privilege asserted should be sustained, or whether the document should be produced. The following findings were crucial to the Special Master's determinations:

> It should be noted that during the time period reflected in the documents the management team of Plaintiff Diagnostic Systems Corporation (DSC) included 5 attorneys. All of these individuals, in addition to being designated as 'General Counsel' or 'Counsel' carried other titles including 'Director,' 'Chief Operating Officer,' and 'Vice-President.' In reviewing the documents it became clear these individuals were at times functioning primarily as attorneys representing DSC and at other times were functioning in the capacity of corporate executives furthering the business goals of DSC, primarily in regard to the licensing of the technology that is the subject of this action. Communications relating primarily to these business functions were generally found not to be protected by the privileges asserted.

R&R at 2:9-2:17.

In response, Plaintiff objects to many of the findings in the Special Master's R&R. For the majority of these objections, Plaintiff argues that these documents were created in anticipation of litigation, even if the documents were also generated for, or also serve, a business purpose. Plaintiff further argues that the documents relate to the Rule 11 investigation for the instant lawsuit, and that any discovery of the documents would be premature. Plaintiff asks the Court to reverse the Special Master and sustain Plaintiff's assertion under the attorney-client privilege, work product doctrine, and/or common-interest doctrine for the following privilege

1  entry numbers: 1144; 855; 797; 942; 794-796; 730; 776; 784; 12-13; 1061; 1067-1068;
2  1097-1112; 1114-1117; 1118; 1120-1121; 1272-1273; 1284-1287; 1289-1298; 40-43; 433-434;
3  443; 526-527; 553-588; 594; 596-609; 612-623; 626-699; 701-706; 708-730; 738-747; 749-759;
4  765-771; 775-777; 779-780; 784; 789-790; 793-800; 802-805; 807-896; 957; 960; 962-963;
5  969-970; 975-981; 983-984; 989; 991; 994-1007; 1009; 1011-1022; 1026-
6  1056; 1058; 1278-1280; 1288; and 1300-1301.

7  Defendants argue that the Court should order production of the documents marked
8  "Produce" by the Special Master. In addition, Defendants argue that the Special Master did not
9  go far enough. Although Defendants do not have access to the *in camera* documents for the
10 purposes of making specific objections, Defendants object to the privilege being sustained as to
11 documents such as privilege entry number 917, as well as communications between Amado and
12 his counsel in the Microsoft action, Morrison & Foerster, and between Amado and his patent
13 attorney, Ronald Fish.

14 At the outset, the Court notes that Plaintiff, through its business structure, attempts to
15 sweep wide swaths of documents within the scope of the privileges asserted. Plaintiff has set up
16 its business in such a way to allow Plaintiff to argue that many documents, including those
17 central to Plaintiff's primary business, are privileged documents. "[T]he burden is on a party
18 claiming the protection of a privilege to establish those facts that are the essential elements of the
19 privileged relationship." *von Bulow v. von Bulow*, 811 F.2d 136, 144 (2d Cir. 1987) (citation
20 omitted). Although Plaintiff has met its burden with respect to many of the documents for which
21 the protected status is sustained, Plaintiff has failed to do so with respect to a substantial number
22 of documents. As such, the Court adopts the Special Master's report in large part, with some
23 modifications to the Special Master's findings. Applying a *de novo* standard of review, *see* Fed.
24 R. Civ. P. 53(f), the Court finds the vast majority of the Special Master's recommendations to be
25 well reasoned and correct.

26 The Court upholds the distinction drawn by the Special Master between documents
27 created when DSC employees were functioning primarily as attorneys representing DSC and
28 documents created when the DSC employees were functioning in the capacity of corporate

1  executives furthering the business goals of DSC. The latter category should not fall within the
2  scope of the broad protection to which DSC claims entitlement. Further, the record is replete
3  with evidence demonstrating the DSC employees' dual roles as both attorneys and business
4  executives. This evidence is affirmed by an *in camera* review of the documents contained
5  within the privilege log.

6        DSC's only business is to analyze, investigate, and attempt to enforce the patents-in-suit.
7  While much of DSC's activities relate to litigation and legal advice, for which the protection
8  asserted by DSC is proper, much of DSC and the related entities' activities center on their
9  business objectives to license and acquire patents and do not bestow the same protections on
10 related documents. Acacia's business "is to acquire rights and patents and monetize them."
11 Vella Dep. at 17. APAC, a subsidiary of Acacia was created to acquire patents and portfolios on
12 behalf of Acacia, which are subsequently assigned to additional subsidiaries because the
13 "economic interests in those portfolios varied." Vella Dep. at 18, 21. DSC is a subsidiary
14 whose only business is "the business of monetizing the patents in suit." *See* Vella Dep. at 18,
15 64, 177. DSC does not make any products and the patents are its only asset. *Id.* at 64, 173, 194.
16 DSC's purpose is to either attempt to license the patents or enforce them through litigation and
17 judgment. *Id.* at 64, 177. In this vein, some of DSC, Acacia, and APAC's employees' functions
18 do occur in anticipation of litigation, but not all. In addition some of the employees'
19 communications are subject to the attorney-client privilege, but not all.

20       As explained by the Special Master, the DSC entities' employees take multiple roles, both
21 business and legal. This distinction is evidenced by examining the activities of Matthew Vella
22 ("Vella"), DSC's corporate representative who is also an attorney. When asked about the
23 company's financial reporting, Vella explained that DSC is a public company and further stated,
24 "I'm the person that tells the rest of the company what might or might not happen with DSC's
25 business. . . . And what I do is meet with them . . . and I give them a state of DSC and a state of
26 other subsidiaries address, if you will. [Lately,] the reporting was so simple that I think I had to
27 create a spreadsheet for DSC." Vella Dep. at 170-174. Vella also prepared a presentation titled
28 "Next Generation Patent Appraisal (Buying Patents)" for the Ocean Tomo Spring 2008 Live IP

1  Auction held in San Francisco at the end of March 2008. *See* Fossum Decl., Ex. A. The
2  presentation is focused on the business of how to identify patents to acquire and "targets" to
3  assert them against, how to "assess value," and how to develop an "assertion plan." *See id.* The
4  presentation details the extensive process and analysis Vella goes through when evaluating
5  patents to acquire and targets to assert those patents against. *See id.* These functions are clearly
6  business functions, and documents resulting from these functions cannot be categorized in
7  sweeping assertions of privileges and protection in order shield the documents from discovery
8  simply because Vella is a lawyer.
9       Just as distinctions can be drawn between specific employees' roles, distinctions can also
10 be drawn between the relevant time periods. Plaintiff attempts to make the time period during
11 which litigation was anticipated as broad as possible. However, Plaintiff's business model does
12 not allow it to claim such broad privileges. The events leading up to the instant litigation
13 demonstrate the distinctions based on relevant time periods. DSC sent out letters to over 100
14 potential licensees in September 2006, seeking to obtain licenses of the patents-in-suit. Vella
15 Dep. at 64. As explained by Vella, during the period leading up to the issuance of these letters,
16 "there [was] a bunch of evidence flying around. We're trying to figure out not only who's
17 getting letters, but who's likely to get sued." Vella Dep. at 127. When speaking about these
18 September 2006 letters, DSC's counsel stated that "none of these letters are accusations of
19 infringement. They're offers to license." *Id.* at 299. Vella further explains, "We merely offer
20 that they might want to evaluate taking a license. That's very different [from an accusation of
21 infringement]. And many of them said no thanks." *Id.* at 304. Such offers to license are a
22 central aspect of DSC's business model. Thus, although DSC claims that litigation was
23 anticipated related to many potential defendants during this time period, the record negates such
24 a claim. It would be illogical for the Court to conclude that DSC anticipated litigation against all
25 of these companies to whom DSC sent letters. After sending the letters, DSC waited several
26 months to sue the Defendants in this action, then waited another ten months to add additional
27 Defendants. The anticipation of litigation was a developing process and varied as to the relevant
28 Defendants. DSC initially pursued its business to monetize the patents, and had not yet

1 formalized specific litigation plans in order to allow it to claim such broad, sweeping
2 protections.

3       These facts negate the broad claims to the work product doctrine and attorney-client
4 privilege that DSC asks the Court to uphold.  With respect to the work product doctrine,
5 numerous authorities have drawn a line between documents created in anticipation of litigation
6 and those not subject to work product protections based on the use of those documents in
7 activities related to the ordinary course of a company's business.  The advisory committee's note
8 to Rule 26(b)(3) explains that "materials assembled in the ordinary course of business . . . are not
9 under the qualified immunity provided by this subdivision."  Rule 26(b)(3), advisory
10 committee's note.  One court explained that "patent infringement investigations, tests or analyses
11 . . . would not be protected from disclosure as work product if they were prepared in the normal
12 course of plaintiff's business."  *Phillips Elecs. North Am. Corp. v. Universal Elecs. Inc.*, 892
13 F.Supp. 108, 110 (D. Del. 1995).  Further, "[a] more or less routine investigation . . . is not
14 sufficient to immunize an investigative report developed in the ordinary course of business."
15 *Green v. Baca*, 2004 WL 1151649, at *5 (C.D. Cal. May 19, 2004) (citation omitted).  "There is
16 no protection for documents prepared in the ordinary course of business, even if they may be
17 useful in litigation."  *Clavo v. Zarrabian*, 2003 WL 24272641, at *2 (C.D. Cal. Sep. 24, 2003);
18 *see also L.H. v. Schwarzenegger*, 2007 WL 2009807, at *8-9 (E.D. Cal. Jul. 6, 2007) (holding
19 that documents prepared as part of "routine" procedures are not protected by work product
20 doctrine); *Kintera, Inc. v. Convio, Inc.*, 219 F.R.D. 503, 507 (S.D. Cal. 2003) (holding that, in
21 order for a document to be protected, it must be one "that would not have been generated but for
22 the pendency or imminence of litigation").  If the Court were to adopt DSC's position with
23 respect to the work product doctrine, virtually all activities engaged in by a company premised
24 entirely on licensing and/or enforcing patents via litigation would be classified as "in
25 anticipation of litigation" and would therefore be work product; such a sweeping application of
26 the work product doctrine is unsupported.  In this case, many of DSC's business activities are
27 distinguishable from DSC's activities in anticipation of litigation.  The Special Master properly
28 excluded documents deriving from these business activities from the scope of the work product

1  doctrine.

2      A similar conclusion is reached with respect to DSC's claims of the attorney-client
3 privilege. In order for the attorney-client privilege to apply, among other factors, legal advice
4 must be sought from a professional legal adviser in his capacity as such, and the communications
5 must relate to that legal advice. 8 J. Wigmore, *Evidence* § 2292, at 554. "The mere fact that
6 outside counsel was copied with the e-mail will not shield communication not made for the
7 purpose of securing legal advice." *United States v. ChevronTexaco Corp.*, 241 F.Supp.2d 1065,
8 1075 (N.D. Cal. 2002). As further explained by the Court in *ChevronTexaco*:

> Corporations may not conduct their business affairs in private simply
> by staffing a transaction with attorneys. Because in-house counsel
> may operate in a purely or primarily business capacity in connection
> with many corporate endeavors, the presumption that attaches to
> communications with outside counsel does not extend to
> communications with in-house counsel.
>
> With respect to internal communications involving in-house
> counsel, Chevron must make a 'clear showing' that the 'speaker'
> made the communications for the purpose of obtaining or providing
> legal advice. In order to show that a communication relates to *legal*
> advice, the proponent of the privilege must demonstrate that the
> 'primary purpose' of the communication was securing legal advice.
> Extending protection to communications primarily and sufficiently
> animated by some other purpose would not be necessary to
> encourage forthright disclosures by clients to lawyers-so such
> communications should not be privileged.
>
> . . .
>
> [W]here . . . the attorneys not only served as legal advisors
> but also helped implement the business transaction, we cannot
> simply assume that every communication involving in-house counsel

12

1  that related to this transaction was made primarily for the purpose of
2  securing legal advice.

3 *Id.* at 1076 (internal citations omitted).

4   Here, DSC properly claims the attorney-client privilege in some instances. However, DSC is not entitled to protection by the privilege simply because in house counsel were involved in the transactions. The management team of DSC and the related entities consisted of five attorneys during the relevant time period, and these attorneys fulfill important business roles for the companies. In those instances where DSC has failed to make a clear showing that the primary purpose of the communication was securing legal advice, the assertion of the privilege is overturned. The Court does not support an assertion of the privilege that will allow DSC to hide behind communications involving its in-house counsel to protect broad swaths of documents, where those communications are not clearly related to a primary purpose of securing legal advice. The Special Master was correct to construe the attorney-client privilege strictly, and to only apply protections where there was a clear showing that the communication was directed specifically toward legal advice.

  In sum, the Special Master properly parsed the specific roles of the employees and the relevant time periods to determine which communications were related purely to DSC's business and which were subject to the attorney client privilege and work product doctrine. Furthermore, DSC's arguments regarding the Rule 11 pre-filing investigation discovery being premature do not preclude production of the documents that the Special Master has recommended be produced. These documents are not the Rule 11 pre-filing investigation; instead, they are documents generated in the ordinary course of DSC and the related entities' line of business. For these reasons, the Court adopts the Special Master's R&R with modifications set forth below.

  Prior to setting forth this Court's modifications to the R&R, however, the Court first addresses the recent arguments made by the parties related to waiver of the privilege between Amado and Ronald Fish ("Fish") and between Amado and Morrison & Foerster ("MoFo"), as well as the Petition to Make Special "search report" ("PTMS Report").

13

1    Defendants argue that Amado waived any attorney client privilege due to the fact that
2 DSC has listed communications between Amado and Fish and between Amado and MoFo on its
3 privilege log. This argument fails for several reasons. At the outset, the evidence indicates that
4 Amado provided these documents to Shore Chan Bragalone LLP ("SCB"), the law firm
5 providing counsel to both DSC and Amado in this action. Amado cannot have waived the
6 privilege by providing this information to his counsel, SCB. Furthermore, there is no indication
7 that Amado provided this information to DSC himself. Defendants ask the Court to infer that
8 Amado provided the information to DSC based on its inclusion on the privilege log. However, if
9 anything, the evidence would likely lead to an inference that SCB provided the information to
10 DSC. An inference that SCB shared these documents with DSC is insufficient to waive
11 Amado's privilege, and it would require inference upon inference to conclude that Amado
12 waived his privilege as to these documents to which the attorney-client privilege clearly applies.
13    Even if DSC possesses this information, DSC is entitled to protection based on the
14 common interest privilege. "[W]here the same attorney represents two parties having a common
15 interest, and each party communicates with the attorney, the communications are privileged from
16 disclosure at the instance of a third person." *Simpson v. Motorists Mutual Ins. Co.*, 494 F.2d
17 850, 855 (7th Cir. 1974). Under the joint client or common interest doctrine, "communications
18 among joint clients and their counsel are not privileged in disputes between the joint clients, but
19 are protected from disclosure to others." *Griffith v. Davis*, 161 F.R.D. 687, 693 (C.D. Cal.
20 1995). "[T]he joint client doctrine typically has been applied to overcome what would otherwise
21 have constituted a waiver of confidentiality because a communication has been shared between
22 two clients." *Id.* Defendants argue that the common interest doctrine does not apply between
23 Amado and DSC because the shared interest is only a financial interest. However, in this case,
24 the shared interest is greater than simply financial. Amado and DSC share an interest in the
25 outcome of the instant litigation. Amado has been substantially involved in this litigation
26 through depositions and numerous court appearances, through which he has been represented by
27 SCB. Although he is not a named party, he is nearly a Plaintiff in the instant action. His clear
28 common goal and involvement in the instant action, as well as his shared counsel with DSC,

1  create a common interest privilege. For these reasons, the Special Master was correct in
2  sustaining the privilege as to those communications between MoFo and Amado and Fish and
3  Amado arising from the prior action.
4      Plaintiff argues in its recent briefing that the Special Master erred in recommending that
5  privilege entry numbers 1272 and 1273 be produced. These documents constitute a Petition to
6  Make Special "search report" ("PTMS Report") and associated invoice, conducted by Patent
7  Agent Matt Kasap ("Kasap"). A petition to make special is a procedural device available to
8  applicants to accelerate and review prosecution of a patent application. Manual of Patent
9  Examination Procedure (8th ed. Rev. 5 2007) § 708.02 ("MPEP"). Section 708.02 requires that
10 the applicant "[s]ubmit[] a statement(s) that a pre-examination search was made, listing the field
11 of search by class and subclass, publication . . . [and] [s]ubmit[] one copy each of the references
12 deemed most closely related to the subject matter encompassed by the claims if said references
13 are not already of record . . . ." *Id.*
14     Plaintiff argues that the "search report" and invoice constitute communications between
15 Kasap (a non-lawyer patent agent), Amado, and Fish (Amado's patent attorney), subject to the
16 attorney-client privilege. The Court finds the reasoning in *Gorman v. Polar Electro, Inc.*, 137
17 F.Supp.2d 223 (E.D.N.Y. 2001), to be directly on point. There, the Court reached a correct
18 holding in explaining that "the attorney-client privilege applies to confidential communications
19 with patent agents acting under the authority and control of counsel, when the communications
20 relate to the prosecution of a patent application in the United States." *Id.* at 227 (internal
21 citations omitted). Thus, it is necessary to determine whether the patent agent was "acting under
22 the authority and control of an attorney when he obtained the information sought to be
23 disclosed." *Id.* at 228.
24     Here, the evidence indicates that Kasap was not acting under the authority and control of
25 Fish. It was Amado himself who sent a letter by facsimile to Kasap requesting performance of
26 the PTMS search report. The letter indicates that Amado had been referred to Kasap by Fish.
27 Kasap then provided the search report to Amado and billed Amado for the services, as evidenced
28 by an *in camera* review of privilege entry numbers 1272 and 1273. The facts that Fish referred

Amado to Kasap and was copied on the invoice and the search report are insufficient to support a finding that Kasap was acting under Fish's authority and control. Instead, Kasap was acting under the authority and control of Amado directly. Under these authorities and this evidence, the Court finds that this was an unprivileged patent agent-client relationship. Thus, DSC has failed to meet its burden as to the attorney-client privilege for these documents. Accordingly, the Special Master was correct in his recommendation that privilege entry numbers 1272 and 1273 be produced.

With this analysis and perspective in mind, the Court adopts the Special Master's R&R with the following modifications after reviewing, *in camera*, each of the documents pertaining to the parties' objections:

- Privilege entry number 1144 is hereby sustained. Both the "Sustained" and "Produce" boxes were inadvertently checked. This is a communication between Amado and outside counsel.
- Privilege entry number 849 is hereby ordered to be produced. This is consistent with the finding as to privilege entry number 855. The document pertains to licensing activities in the ordinary course of DSC's business.
- Privilege entry number 797 is hereby sustained. This is consistent with the finding as to privilege entry numbers 800 and 801. The document includes communication with outside counsel for the purposes of obtaining legal advice.
- Privilege entry number 940 is hereby ordered to be produced. This is consistent with the finding as to privilege entry number 942. This is a communication between Amado and DSC regarding DSC's ordinary course of business and licensing plans.
- Privilege entry numbers 795 and 796 are hereby sustained. These documents are draft claim constructions prepared by outside litigation counsel. This is consistent with the findings as to privilege entry numbers 541, 542, and 986.
- Privilege entry number 730 is hereby sustained. This document was prepared by outside legal counsel and compares claims of patent and infringer products. This

1    is consistent with the findings as to privilege entry numbers 541, 542, and 986.

2  • Privilege entry number 776 is hereby sustained. This is consistent with the
3    findings as to privilege entry numbers 541, 542, and 986.

4  • Privilege entry number 778 is hereby ordered to be produced. This is consistent
5    with the finding as to privilege entry number 784. This is a communication
6    between Amado and DSC regarding DSC's ordinary course of business and
7    licensing plans.

8  • Privilege entry number 443 is hereby sustained. The communication between
9    counsel clearly demonstrates specific considerations related to anticipated
10   litigation.

11 DSC has failed to meet its burden to show that the privileges asserted apply to all other
12 documents for which the Special Master has recommended production. All other objections by
13 DSC and Defendants are hereby OVERRULED. DSC is hereby ORDERED to produce all
14 documents in compliance with the findings contained in the REPORT OF SPECIAL MASTER /
15 DISCOVERY REFEREE subject to the above modifications. DSC shall produce these
16 documents no later than August 27, 2008.

17 **IV.    DISPOSITION**

18 For the above mentioned reasons, the Court hereby adopts the Report of the Special
19 Master with modifications. DSC is hereby ORDERED to PRODUCE the documents denoted by
20 the following privilege entry numbers:

21  • 12-13;
22  • 40-43;
23  • 204;
24  • 234-235;
25  • 431-436;
26  • 444;
27  • 479;
28  • 481;

17

1. - 526-527;
2. - 553-729;
3. - 731-775;
4. - 777-794;
5. - 798-799;
6. - 802-842;
7. - 845;
8. - 849-852;
9. - 854;
10. - 856-896;
11. - 925;
12. - 940-985;
13. - 987-991;
14. - 993-1022;
15. - 1024-1121;
16. - 1272-1273;
17. - 1278-1280; and
18. - 1282-1302.

These documents shall be produced no later than August 27, 2008.

IT IS SO ORDERED.

DATED: August 12, 2008

_____
DAVID O. CARTER
United States District Judge